## Nunn et al. v. Justice.

June 2, 1939.

812

Stratton & Stephenson for appellants.

J. J. Moore and Henry J. Scott for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

The appellee, Joe H. Justice, and his wife, Haliah, were married in the year 1908, when they were both about 17 years of age. Appellee acquired a farm in Pike County and he and his wife resided there for a number of years, but sold this farm and moved to Pikeville. He was very successful in his work as a carpenter and contractor and acquired considerable real estate in Pikeville worth approximately $75,000. Two daughters were born to them, Champ and Merle, who are appellants in this appeal.

Appellee and his wife seem to have been very proud of these two daughters and devoted their lives to promoting their welfare and happiness and to acquiring an estate with the idea that these girls should be well pro-

vided for in life. The girls were given every advantage in life and both graduated from the University of Kentucky. At one time the entire family went to Arizona for a year when one of the girls developed lung trouble, and another year was spent at Asheville, North Carolina, where the children went to school, the object of this being to complete the cure of the lung trouble which had developed in one of the girls.

As appellee prospered in his business he continually purchased real estate in Pikeville and all such real estate was conveyed to him and his wife jointly. In the year 1920 he and his wife had title to two lots in Cline Addition known as lots 19 and 20, of the value of $4,600 and $4,200 respectively. On June 4, 1920, appellee and his wife conveyed these two lots to the two daughters, and in the deed the right was reserved later to make a division, that is, to designate a particular lot to each daughter. That deed contained the following provision:

"Said first parties reserve the right to control this property during their natural lifetime. It is further understood that if either of the first parties should remarry after the death of the other, then this deed should take effect and become the property of the second parties. The party of the first part reserves the right to divide the property equally between the two parties of the second part if deemed necessary for any reason."

By the year 1933 appellee and his wife had acquired the other real estate involved in this action, which consisted of an apartment building known as the Justice Apartments, valued at approximately $30,000, a house and lot on Julius Avenue valued at $12,000, a house and lot on Park Avenue valued at $9,000, a lot known as the Hope-Wellman lot valued at $1,500, a lot in the Williamson Addition known as lot No. 7 in block 6 valued at $1,500, and a lot on Williamson Avenue known as the Taylor lot valued at $750.

On July 17, 1933, appellee and his wife in company with the two daughters, went to the county clerk's office in Pikeville and there had drawn by the clerk three deeds. By one of these deeds they conveyed to Merle the Julius Avenue property and lot No. 20 in the Cline Addition, which had been conveyed to Merle and Champ jointly by the deed in 1920, it being specified that the

conveyance of this lot was made pursuant to the right retained in that deed to make a division. By another of the three deeds they conveyed to Champ the Park Avenue property and lot No. 19 in the Cline Addition in the same manner that lot No. 20 was conveyed to Merle. By the third of these deeds they conveyed to Merle and Champ jointly the Justice apartment building. Champ later conveyed to her husband a one-half undivided interest in the property conveyed to her.

In each of the three deeds of July 17 the following provision appears:

"First party shall hold and control any or all property mentioned in this deed as long as they live, so long as neither marries again. If either member of the first party marries again that member shall lose all control of the property."

It was also provided in each of the three deeds that if first parties saw fit to turn over the property to second parties, the second parties should pay the first parties a certain stated monthly rental, and the deed to the apartment building provided that "Eight hundred dollars in rents and profits will be used to put in heat in the house located on Park Street which is deeded to Champ Justice this same day, unless first party installs the heat plant in the said house." After the deeds were drawn by the clerk, they were lodged for record and appellee paid the recording fees thereon and they were duly recorded.

On October 25, 1933, about 6 o'clock A. M., the appellee's wife shot him in the leg with a pistol and immediately shot and killed herself. On September 12, 1934, appellee remarried, and on May 25, 1937, this action was filed by appellants to recover possession of the property conveyed to them by the three above mentioned deeds of July 17, 1933, and for the sale of the other property above mentioned owned by appellee and his wife, which had not been conveyed to the daughters, but in which they had inherited the one-half interest owned by their mother. The appellants in this action also sought an accounting from appellee for the rents and profits on the property since his remarriage.

Appellee defended on the grounds that the three deeds executed on July 17, 1933, were executed by him by reason of fear of his wife and duress imposed by her on him; that she was insane and had repeatedly threatened his life if he did not make the deeds, and that they

were only made by him in order to save his life. He also pleaded that as to the Hope-Wellman lot in which his daughters inherited a one-half interest from their mother, he had erected a house thereon at a cost of $6,000, believing that he was the rightful owner thereof and that his daughters knew this fact and knew that he was the owner thereof and knew that he was spending the money in making these improvements and made no complaint and failed to assert any right, title or interest therein while the work was being done, and that, by reason thereof, they were estopped to assert any right, title or claim to said improvements. He also alleged as to this property that he paid the entire consideration, but that his wife demanded that the deed be made to him and her jointly and that same was made in this manner solely and alone on account of the duress of his wife and fear upon his part of losing his life if he did not comply with her wishes. He asked a reformation of the deed to said property so as to show himself to be the sole owner thereof.

He pleaded also that the above mentioned provision in the three deeds, by which if he married again he should lose all control of the property, was void as being in restraint of marriage and that there was no delivery of the deeds.

The trial court, without indicating on which of the defenses interposed by appellee the judgment was based, adjudged that the three deeds were void and that appellee and appellants were the joint owners of an undivided half interest in all the above mentioned real estate, which had been owned jointly by appellee and his wife, and that appellee was entitled to his dower interest in the one-half thereof inherited by appellants from their mother. Appellee was also adjudged a lien on the Hope-Wellman property to the extent of the improvements made thereon by him. All the property was ordered sold for division of the proceeds between appellee and appellants, and from that judgment this appeal is prosecuted.

The evidence relied on by appellee to establish that the deeds of July 17, 1933, were made under the duress of his wife and by reason of his fear that she would kill him if he did not execute the deeds in this manner is largely his own testimony with reference to conversations with his wife and threats made by her to kill him if he did not execute the deeds, supported by testimony

of Mrs. Katherine Blackburn, Mrs. Nancy Goff (his sister), Docta Justice and Matt Justice, who testify to having heard appellee's wife make statements at various times that she was going to kill appellee unless he executed the deeds. Docta Justice also testified that after the deeds were made appellee's wife said, "Well, I made Joe make them deeds. I made him make them the way I wanted to; he knows to do what I tell him."

The testimony of appellee concerning these conversations with his wife and threats made by her is plainly incompetent. They are squarely within the inhibition of subsection 2, Section 606 of the Civil Code of Practice. It is true that testimony of this character would have been competent if such conversations or threats took place in appellant's presence, but appellee offered no testimony with reference to threats made by his wife in the presence of the girls; in fact, in his testimony in rebuttal he was asked about a conversation between him and his wife in which his wife asked him why he was in a hurry about making the deeds and he said that he told his wife and daughters he was in a hurry to make the deeds but did not tell them why, saying that he didn't want the children to know anything about it. It is apparent from this statement that no threats were ever made against appellee by his wife in the presence of his daughters and that if any were actually made at all, he never told his daughters about them. All such testimony of appellee concerning threats made by his wife is incompetent, as he did not pretend that any of them were made in his daughters' presence. When this incompetent testimony is excluded from the record, there is left only the testimony of the witnesses above mentioned as to the statements made by Mrs. Justice, which falls far short of establishing with any degree of certainty that fear of his wife caused appellee to execute the deeds.

However, even though his testimony was competent, we would have great difficulty under the circumstances disclosed in evidence in believing that the deeds were executed under duress and by reason of appellee's fear of his wife. The execution of the deed in the year 1920 conveying to his daughters lots No. 19 and 20 in the Cline Addition containing in substance the provisions contained in the three deeds in controversy evidences a fixed purpose on the part of appellee to place title to his property in his daughters in the same manner

as was done by the three deeds of July 17, 1933, and his permitting the deeds to stand as executed for a period of almost a year after his wife's death and before his remarriage seems to be utterly inconsistent with the fact that his wife compelled him to execute the deeds. Appellee makes no pretense that he ever notified his daughters or any other person up to the time of the filing of this action in 1937 that he had executed the deeds on account of any fear of his wife. It is incomprehensible and unbelievable that he would have made no complaint to any person for a period of several years if he had executed the deeds only for this reason. Appellee states that his wife was insane and that for this reason he knew she would carry out her threats to kill him, but no other witness testifying in the case stated that Mrs. Justice was of unsound mind. The strongest statement made along that line by any witness was by Docta Justice, who said she had a conversation with Mrs. Justice in which she stated that she loved her husband and that when he died she wanted to die, and that Mrs. Justice had a pistol in the automobile which she showed the witness, and that she "looked wild, her eyes didn't look right."

Appellee's two daughters testify that the family had a very happy home life up until several weeks before the death of Mrs. Justice. They state that appellee and his wife had for years had a fixed purpose to convey the property to them and had talked about it many times, that appellee wanted to make the deeds at the time of their graduation at college, but that they were in no hurry to have the deeds executed and cared little about it and suggested that he give them presents of bedroom suites for graduation presents instead of making the deeds, which he did. They testified that on the night before the deeds were executed the appellee stated that he intended to execute them the next day and that they all talked over the provisions of the deed and that one of them wrote down on a piece of paper the provision in the deed quoted above by which the life estate reserved in the property was to go to the grantees in the deed if either of the grantors married again. They also testified that the first serious trouble between appellee and his wife was when Mrs. Justice learned that appellee was having an affair with a woman out on the road on which he was working; that when she learned of this by an anonymous letter she took both of her

daughters in a car with her and went out on the road to investigate this report and found out that it was true. We might add that the evidence indicates strongly that this report was true. From this time on, according to the testimony of the girls, relations were very strained between their father and mother, culminating in his moving to a separate room in the house. Numerous witnesses were introduced for appellants who testified as to the soundness of Mrs. Justice's mind. All of these witnesses apparently looked on the Justice home as a very happy and congenial home. On the whole, the evidence indicates that the tragedy in the home was probably a result of Mrs. Justice's brooding over the actual or imagined unfaithfulness of her husband. This is by no means clear and definite from the evidence, but seems to be the most logical inference to be drawn from it.

Appellee's statement as to what occurred at the clerk's office at the time of the execution of the deeds in his effort to show that the deeds were made under duress is as follows:

"As I remember it, as I said before, I gave the description and gave it down to where this clause came in about the marrying, and I hesitated and kindly stopped, and Mr. Coleman looked up at me, and my wife was standing at my left side and says, 'you are about to forget something aren't you,' and looked down at her breast, and I took it from what she said before what she meant, she would carry out her threats."

His two daughters testify that on this occasion their mother had on a light summer dress and that it would have been impossible for her to have had a pistol concealed therein. Clifford Coleman, deputy clerk who wrote the deeds, and Fern Wolford, another deputy clerk who was present when they were written, both testify as to the writing of the deeds, and there was nothing unusual in the attitude of the parties towards each other sufficient to attract the attention of these two witnesses or to arouse their suspicions, although they say they thought the provisions of the deed were unusual, and Coleman says that Mrs. Justice was the one who made the suggestion about putting in the provision with reference to remarriage. He did not remember whether that provision was dictated to him by Mr. Justice or by Mrs. Justice.

This testimony of appellee and of the clerks who were present when the deeds were drawn does not add any weight to the other testimony in his behalf—on the contrary, the scene portrayed in the clerk's office indicates a free and voluntary execution of the deeds by appellee. He apparently saw something that nobody else who was present saw. He also had ample opportunity to return to the clerk's office and prevent the recording of the deeds after he had left the office with his wife.

Considering all the testimony on this issue, we are firmly of the opinion that appellee executed the deeds freely and voluntarily.

It seems to us apparent that appellee has seized on the circumstances that his wife shot him and then killed herself several months after these deeds were executed as giving color and possibly a degree of plausibility to his defense that he only executed the deeds on account of his wife's threats to kill him if he did not do so.

It is suggested in appellee's brief that there was no delivery of the three deeds of July 17, 1933, and that therefore no title passes to his daughters. However, the general rule is that the lodging of a deed for record in the proper office by the grantor is sufficient to constitute a delivery. Combs v. Ison, 168 Ky. 728, 182 S. W. 953; Atkins v. Globe Bank and Trust Co., Ky., 124 S. W. 879. It might be that lodging for record would not operate as a delivery where the grantee is an adult and no knowledge or acceptance is shown on the part of the grantee. In the case at bar, however, both of appellee's daughters, the grantees in the deeds, were present when they were drawn and lodged for record, taking part in the transaction, and, under these circumstances, the lodging for record undoubtedly constituted a valid delivery of the deeds.

Concerning appellee's contention that the provision in the deeds of July 17 by which the estate retained in the property by appellee terminated on his remarriage is void because the provision places an unreasonable restraint upon marriage, we find that, by the great weight of authority, conditions or limitations of this character in restraint of remarriage are valid. In Pomeroy on Equity Jurisprudence, 4th Edition, volume 2, Section 933, it is said:

"It seems to be settled by an overwhelming weight

of authority that limitation and conditions, precedent or subsequent tending to restrain the second marriage of women are valid, and by the most recent decisions the same rule has been applied to the second marriage of men."

In Page on Contracts, volume 2, Section 930, it is said:

"A contract whereby a competent person who has once been married, agrees not to marry again or a contract whereby such person will be subjected to loss in case he does marry again, is not invalid as being in restraint of marriage."

The same rule is laid down in Williston on Contracts, volume 6, Section 1741, and in Restatement of the Law on Contracts, Section 581, this rule is enunciated:

"A bargain not to marry, or to be subject to loss or deprived of profit in case of marriage or a bargain to hinder or prevent the marriage of another is illegal, unless the bargain is otherwise reasonable and the restraint is incidental to another lawful purpose of the bargain."

The provision in question, although it appears in a deed, amounts to nothing more or less than a contract between the appellee and his wife and between the grantors and grantees in the deeds that appellee should have control and enjoyment of the property conveyed so long as he did not remarry, but that such estate should be terminated on remarriage. The purpose of the deeds was to vest title in the grantees, appellee's daughters, and the restraint against remarriage voluntarily imposed on himself by appellee was merely incidental to this main purpose.

This court has uniformly upheld devises in wills to the testator's wife so long as she remained his widow. In Eastham et al v. Eastham et al., 191 Ky. 617, 231 S. W. 221, 222, a deed from husband to wife contained the provision " 'The second party is to have the first described property so long as she lives or remains his widow; should first party die first. At the death of second party, or should she marry again, then this property goes to the children of the first party by his first and second wife.' " It was held that this provision was valid and that the estate of the wife ended on her remarriage.

Appellee cites 8 R. C. L., page 1118, Section 180, to the effect that a restraint on marriage may be invalid when imposed by way of condition when it would be valid if made by way of limitation, and the suggestion is made that the estate retained by appellee is defeated by the provision in controversy as a condition and not as a limitation, but we cannot agree with this contention. In Coppage v. Alexander's Heirs, 2 B. Mon. 313, 38 Am. Dec. 153, the language of the will was "I give unto my beloved wife, Mary Alexander, the half of my land I now own during her widowhood or life." It was held that such a devise should be construed as a limitation expressive of the duration of the estate and not as a condition subsequent or prior. The court says that the happening of either event, death or remarriage, was intended to terminate the estate. In the case at bar, the estate reserved by appellee was for the duration of his life, so long as he did not marry again. Either death or remarriage terminated the estate reserved and on remarriage his estate expired by limitation.

In the light of the authorities above cited, we reach the conclusion that the estate reserved by appellee in the deeds expired by limitation on his remarriage and that such provision is not void as being in unreasonable restraint of marriage.

We have great sympathy for the appellee in the predicament in which he now finds himself and little admiration for the conduct of the appellants, who now seek apparently to deprive their father of practically all the estate owned by him, but appellee placed himself in this position by executing the deeds and by remarrying with full knowledge that the estate reserved by him in this property terminated on his remarriage, and no legal way appears to us to afford him any relief from the hardship he knowingly brought on himself.

The appellants are entitled to an accounting for rents on the property after the remarriage of appellee. The trial court made no finding on this question. On the return of the case the parties should be allowed to present evidence on this question, and, after hearing this evidence, the trial court should make a finding thereon. All other questions are expressly reserved.

The judgment is reversed for further proceedings consistent with this opinion.